Welcome to the last day of our panel sitting here in Atlanta. It's been a pleasure for Judge Rosenbaum and myself to be here, and we've been very lucky to have with us two very good district judges helping us out with our work. Judge Steele sat with us on Tuesday and Thursday, and on Wednesday and today we have Judge Harvey Schlesinger from the Middle District of Florida. He sits in Jacksonville. He has sat with us a number of times, and we're very, very glad and very, very happy that he's here helping us once again. So we're almost ready to begin. You know our time system. When the yellow light goes on, that means that your time is drawing to a close, so begin to wrap up. If we take you beyond the red light, then don't worry about it. Just keep going. And with that, we'll start with our first case, number 21-11982, Ralph Benning v. Commissioner, Georgia Department of Corrections et al. Mr. Jones. Thank you. May it please the Court, I'm Stanton Jones from Arnold & Porter, and I represent the plaintiff, Ralph Harrison Benning. The District Court erred in granting summary judgment for defendants because their censorship of Mr. Benning's emails violated both the First Amendment and the Due Process Clause. Mr. Jones, I don't want to break up your narrative or your argument, but I need to ask you one question that's procedural and I'll ask Mr. O'Troupenstadt the same thing when he gets up. As I read the record, there were some modifications by the Department with regard to the policy, certain things that they weren't doing anymore. For example, the screening of recipients. Can you just tell me what you believe is still at issue with regards to the policy? It has sort of changed a little bit over time since the litigation began, because I think, for me, I need to just nail that down before we get into the merits. Yes, Your Honor, certainly. So, several of the emails here were censored pursuant to a policy that prohibits prisoners from asking that their emails be forwarded to anyone else. Correct. The defendants initially justified that no forwarding policy on the ground that it was necessary to enforce a different rule, which was a rule that limited the people that prisoners may email. The defendants said there is a rule that prisoners can only email people on an approved list, their approved visitor list who have passed criminal background checks, and allowing prisoners to email people on that list but then ask them to forward the emails to other people would allow prisoners to circumvent the rule limiting who they can email. Since then, Mr. Benning attested, and I believe the defendants have not contested and don't contest, that there is no longer any limit on who prisoners may email. Prisoners now, today, our understanding, may email anyone they want. And so, that's significant because it undermines and, frankly, eliminates the main justification that the defendants had put forward for the policy prohibiting inmates from asking that their emails be forwarded. There no longer is any underlying. I know you have an argument related to that, but let's make sure we get the policy in place first. Any other modifications to the policy, the forwarding policy, or the inmate information policy since the litigation began? No changes to my knowledge. I believe that both of those policies, the no forwarding and no inmate information, are still in place today. The policy that we understand has been changed is only the prior rule limiting inmates only to being able to email people on their approved visitor list who had passed the background checks. And nothing with the no notification? There still, to my knowledge, is no requirements to give notification or notice or any opportunity. And, of course, Mr. Benning didn't receive notice or any opportunity to respond with respect to any of the censorship that occurred at issue in this case. So, to be clear then, the policy that required, that limited the people to whom Mr. Benning could email is moot now? The argument about that one? None of Mr. Benning's emails were censored pursuant to that policy. He had emailed his sister and the Aleph Institute, who I understand were on his approved list, his sister and a rabbi at the Aleph Institute. Those emails were censored pursuant to other policies, the no forwarding policy and the no mentioning anything about any other inmate policy. The reason that the rule limiting prisoners to only emailing certain people was relevant is because that was the defendant's justification for the no forwarding policy. They said we can't have inmates asking their approved recipients to forward the emails on to other people because that would circumvent the rule that says you can only email these 10 people. But they've gotten rid of that rule. Can you add two minutes to his time, please? Thank you, Your Honor. So while this appeal raises important questions about the applicable legal standards for Mr. Benning's constitutional claims, Your Honor, under any standard, censorship requires some connection to the government's interests in prison security or safety, and there's simply no such connection here. Three of Mr. Benning's emails alleged contain serious allegation of corruption by prison officials, and the defendants censored those emails because Mr. Benning asked his sister to forward them to members of Congress. He sent a fourth email to a rabbi at the Aleph Institute about his request for a kosher diet, and the defendants censored that email because he simply mentioned at the end of it that another observant inmate had been recently transferred to Wilcox Prison, which was publicly available information on the Georgia Department of Corrections website. As to your claim for injunctive relief against the commissioner, that was a facial challenge, an as-applied challenge, a mixture of the two depending on the policy, or what? Yes, so two responses. First, we think that questions about the specific scope of injunctive relief are probably premature at this point. I think you're right. That's not my question. My question is, was the challenge on the claims for injunctive relief, whatever that relief was or wasn't, were those facial challenges to the two policies, or was it one of one or one of the other as to the two different policies? I would say we are challenging the application of those two policies to outgoing emails, not necessarily just to these specific emails, although the policies are clearly unconstitutional as applied to these specific emails or emails like them, but our position is that, and I'll get to the legal standard question in a minute, but that restrictions on prisoners' outgoing emails are subject to heightened scrutiny under Martinez, for reasons I'll explain, and neither of these policies, the forwarding policy or the inmate information policy, they cannot plausibly satisfy Martinez, or at least there were triable questions that foreclosed summary judgment. So they are facial challenges? They are facial challenges to the application of these policies to outgoing emails. Sounds like a hybrid. I would describe it as more facial. We are not limiting the challenge only to the which would include outgoing emails as subject to heightened scrutiny, and when you apply that heightened scrutiny under the Martinez standard here to these restrictions, they fail. No matter what the content of the email is? Well, censoring the emails only because they contain a forwarding request or some unidentified information about an inmate, yes, fails heightened scrutiny under Martinez. Now, the defendants have a number of other policies that prohibit all kinds of other content in emails and letters and all other correspondence. They prohibit threats and all other manner of dangerous information, and we're not challenging any of those. So to the extent that any of Mr. Benning's emails are picked up through the keyword or phrase searches and are policies that are actually connected to prison security or safety of people inside or outside the prison, those are not being challenged. But censoring an email simply because it asks the recipient to forward the message to someone else without knowing anything else is not rationally connected to any legitimate government interest and can't stand. On the due process claim, let me see if I have the argument right. Your contention is that putting aside the merits of the First Amendment claims, so assuming you lose on those claims, that does not determine whether or not Mr. Benning has a liberty interest in his due process is required. And because the district court sort of found that there was no due process protection based on lack of a liberty interest, based on lack of a First Amendment claim, that that was wrong. Yes, that's exactly right. Yes, I'm not sure I could say it better. Our position is that when the prison censors emails, prisoners emails, the prisoners are entitled to the minimum due process safeguards, which are notice and an opportunity to respond. The prison didn't provide any notice whatsoever here or opportunity to respond. That's consistent with the prison's policies, which don't require any notice or opportunity to respond. And regardless of whether the underlying censorship is found to violate the First Amendment, prisoners are entitled to due decades that that applies to all forms of correspondence, which would include emails. All right, let's, can we pivot a little bit to the qualified immunity issues as to the individual defendants? Yes, certainly. So the question I had after reading the magistrate judge's report, the district judge's order, and the briefs is, there's a lot of debate about what standard of communications by inmates. And you may have the better of the argument, or the defendants may have the better of the argument. But we certainly have not settled that issue, and the Supreme Court certainly hasn't. So with regards to not the due process claim, but the First Amendment claims, why do you think that the individual defendants are not entitled to qualified immunity? So, Your Honor, it's been clear since Thornburg in 1989 that the Martinez heightened scrutiny standard applies to all forms of correspondence. That's what the Eighth Circuit, the Eighth Circuit in 2009, said in the Bonner case that that's been clear for decades, that Martinez applies to all forms of correspondence. And in that case, the prison officials argued, we weren't on notice, we didn't have any fair warning that Martinez would apply to packages because Martinez was about letters. The Eighth Circuit said that that argument strains credulity. I know, but for purposes of qualified immunity, another circuit's decision is usually not the sort of case that can set clearly established law, right? Well, I think it's the Eighth Circuit's recognition over a decade ago that the Supreme Court's precedent had been clearly established for decades before that that helps illustrate how clearly established this law is. It's not simply the Eighth Circuit's decision. I understand Georgia prison officials might not read the Eighth Circuit, but certainly an awareness of Supreme Court precedent that another circuit found again in 2009 had been clearly established since 1989. So you don't think Safley applies at all? Turner v. Safley does not apply here because in Thornburgh, the Supreme Court held that the Turner standard, the more deferential Turner standard applies to incoming correspondence, that is any correspondence that prisoners receive, either from another prisoner or from someone outside the prison. And the Supreme Court said Thornburgh very expressly, the heightened scrutiny under Martinez survives and applies to prisoners' outgoing correspondence, correspondence leaving the prison. And Thornburgh explained in detail. It didn't just say that. It explained in detail the rationale that outgoing correspondence, unlike incoming correspondence, simply does not by its and emails were invented. It was, although the Supreme Court has said since the 1990s, when email was still pretty early on, as I recall, that an email is just akin to a letter or note that gets sent electronically instead of with a stamp. The Supreme Court has recognized that almost as long ago as Turner and Thornburgh. So just with respect, though, to the clearly are you I mean, are you aware of any either 11th Circuit cases or Supreme Court cases where the Martinez standard has been applied since after Thornburgh? Yes, the Martinez standard is applied to outgoing correspondence of all sorts all the time. This court applied it in prison legal news. The 8th Circuit applied it in Bonner. There are multiple district court decisions that apply Martinez to outgoing emails, and the district court in this case acknowledged those decisions. On the flip side, and I think this is important, I'm not aware of a single case ever refusing to apply Martinez to outgoing emails or to the fact that no one hasn't applied. It doesn't really clearly establish it, but I understand your point. Of course, we can't rely on the district court cases either. Yes, I understand that. I think for clearly established for qualified immunity, our strongest argument would be the 8th Circuit's decision saying over a decade ago that for many decades, it's been clearly established that Martinez heightened scrutiny applies to all a claim that Martinez was just talking about letters. It doesn't apply to some other form of correspondence, but regardless of qualified immunity, of course, Mr. Benning would be entitled to injunctive relief rather than damages. One more question about the factual aspect of the record. Do the department's policies have a similar prohibition on forwarding with regards to hard copy mail? No. Okay. All right. Thank you very much. You've saved your time for rebuttal, Mr. Jones. Thank you. Can you tell me how to pronounce your last name? Yes, Your Honor. It's Atrio Persaud. Okay. Welcome and whenever you're ready. Thank you, Your Honor, and good morning. May it please the court, my name is Rodney Atrio Persaud with the Georgia Department of Law on behalf of Appellees. And if Your Honor would like me to go into the preclearance issue that you asked my friend about? No, right. The first thing I want to ask you is the same thing I asked him, which is the only thing that has changed since the beginning with regards to the department's policy is that there is no longer a corresponding rule limiting the people with whom an inmate can correspond. Is that right? That is correct, Your Honor. And so at the beginning, in this case, it all started at the infancy of emails in prisons. And so at the beginning, the Georgia Department of Correction treated emails like telephone calls. And with telephone calls, there was a preclearance requirement because of the security concerns that telephone calls like emails create. And so you had that preclearance issue where only those who were allowed to visit Mr. Benning, for example, have been cleared by security could communicate through email. Of course, after email, the proliferation of the use of email became so much, the Georgia Department of Corrections just couldn't do that kind of preclearance work anymore. And so they are relying on the electronic screening process that is part of this case going forward. And it's not true also, as my friend on the other side suggests, that Mr. Benning can communicate with anyone out in the outside world. The way it functions operationally is that someone on the outside world has to sign up for a JPAY account and agree to communicate with Mr. Benning. And then Mr. Benning and that person on the outside world can communicate with each other. So there's sort of a functional barrier. But, Your Honor, going to Judge Rosenbaum's point, there is no case from the United States... Before you get into your argument, one more factual question, the same one I asked Mr. Jones. So the Department does not limit inmates from requesting that their hard copy mail be forwarded. In other words, if Mr. Benning had sent a regular letter on paper to his sister and said to her in that letter, please forward this letter to members of Congress, that would not have been a problem. And that's not... that would not have been a problem. And that's what happened in this case, Your Honor. Mr. Benning forwarded the emails at issue here to his sister. And according to his testimony, his sister received them. And according to his testimony, he believed his sister forwarded them as instructed. If that's the case, what's the justification for the email policy? The justification for the email policy is that emails are just more... that emails are just different. They're more efficient. They're faster. They create more... So you want to make it harder for inmates to get their grievances out? No. It's easier to do it by email. So you want to make them do it by hard copy mail? No, Your Honor. What we want to do is prevent security threats that email uniquely pose. And I'll give you an example, Your Honor. I'm sorry, Judge Rosenbaum. But counsel, I mean, it seems like if anything, it's easier to review emails than it is to review written correspondence. First of all, it's searchable by fields or words. And second of all, you don't have to go through the hassle of trying to decipher the handwriting. So I'm not understanding why... and it gets there instantly... is a reason why it somehow presents more difficult challenges to security. Well, let me give you an example, Your Honor, that I think will highlight the concerns, the underlying concerns here, and the security connection that my friend said doesn't exist. Suppose prisoner sends an email to mom and say, Mom, there's a bug or a flu bug going around in the prison and no one is working here today. The prison is understaffed, right? That would be just an officially innocuous email to mom about what's going on in the prison. But take that in the context of real problems where contraband, drugs, weapons, and the like are being constantly smuggled into the prison. Now take that, that officially innocuous email, and if the prisoners say forward this to Adam, now that doesn't just become an email where the prisoner is talking about understaffing. That becomes an email that's forwarded to Adam saying, you know what, there's no staffing or there's understaffing in the prison today. It might be a good day today to make a drop or to smuggle some contraband in. Let's take the other example. I'm sorry. Can that inmate send an email under the department's policies to both mom and Adam at the same time? I think they can only email one person at a time the way it works. But he can send a separate email to mom and to Adam and the department doesn't have any problem with that? Which would lead to the same problem you're mentioning now? He could, but as I said, there's a functional sort of there's a functional gap where Adam would have to sign up for a JP account. I'm assuming Adam has done that. Yeah. His whole family has signed up. Two brothers, a sister, an uncle, and an aunt. And he just copies and pastes the same email and he sends it to every single one of them. That's perfectly okay? That wouldn't run afoul of the policies that exist, Your Honor. Then how does the policy serve the department's objectives as you've described them? Because, as I said, the efficiency with which email gets to the outside world, the fastness and not just in getting to the outside. But why does that matter? Why does that matter? Because you still have to review it before it's let out, right? I mean, you're reviewing it, so it may get out fast after you approve it, but it's not going anywhere until you approve it. And the way that you review it is a lot faster and more efficient than the way you review handwritten letters. So why does it matter that email travels instantaneously after you review it? Well, Your Honor, that's correct. There is a slight delay and it is being reviewed, but it's being reviewed electronically. And the example that I proposed to Your Honor earlier with, you know, just telling mom that, you know, everyone is sick and no one's working today, that would probably be a facially innocuous email that wouldn't get flagged and would probably go out to the prison almost instantaneously. And then if you ask that that email be forwarded to Adam, and not only that, if you included the end of that saying, you know, my friend Charles is working the yard these days. Now that could be interpreted as saying, you know, giving mom an update as to Charles's new job. But it could also indicate to Adam that, you know, Charles is working the yard and there's no, there's understaffing at the prison. You know, today might be a good day to do a drop and to smuggle something into the prison. And Your Honor, prison officials... I think Judge Schlesinger has a question. Where are the reviewers? Are they at the local institution or at some centralized location? They're at the centralized location in Forsyth. The way the email process works is that it's processed through the central office. If it's flagged after an electronic screening process, then it's reviewed by an analyst, like the individual... Yeah, where are the analysts? In the central location? They are. Okay. So sending an email saying we're understaffed today isn't going to slow the process down. Not unless it's flagged. Not unless it has a forwarding request, for example, like the one Mr. Benning has here. Not unless it has another prisoner's information. Not unless it has one of the key words that the electronic screening process looks for. So the facially innocuous email I was describing to Judge Rosenbaum would probably go through and survive the electronic screening process. But then if you have that email forwarded to someone else who may be a co-conspirator on the outside world, and then containing other information that puts security... I'm sorry. No, it's okay. But here's where I'm getting a little confused. You said that if it asks to be forwarded, it's going to be flagged. Is that right? Yes. Okay. So, and that's the same for a handwritten letter, right? I mean, if it's asked to be forwarded, somebody's going to look carefully at that, right? Yes. I mean, they're going to send it out because you said it was okay, right? They're allowed to do that. They're allowed to send it out. But if you're going to, so if you're going to look at the, if it's going to be flagged and analyzed by a human being anyway, if it says to forward it, what is the difference? The difference is the efficiency and the quickness of email that makes it different from the threats, for example. That's what I'm not understanding. What about the efficiency of email makes it different? If you're, if you're going to flag it anyway, your system is going to pick it up and then someone's going to look at the part that says forward it. Forward it, please. Why is that any different? Why does the fact that you can send email quickly make any difference to the analysis? Well, Your Honor, because the example I gave you, the facially innocuous email, an analyst reviewing that could say, well, he just wants to tell his friend Adam that there's understaffing and maybe there's nothing cynical here and may allow that email to go through. In that instance, that analyst who wasn't as diligent as the individual defendants in this case may create a security threat for the prison. And in that instance, because of the instantaneous and the quick nature of emailing, they could. You're saying that, that the reason it's different is because of the risk of error. If you, if you allow something to, although you're allowing everything to be forwarded anyway, when it's handwritten, if you allow something to be forwarded when it's handwritten, it's going to take at least three days and the news won't be current anymore. But if you allow something to be forwarded when it's emailed and it has current news in it, then that current news could be used as intelligence. Is that what you're saying? That's correct, Your Honor. And you can, and in the, in the world of, you know, cell phones and prisons and so on, a threat could go out through email and then instantaneously a call could come in for a hit on a gang member or something in prison. You know, the, this court said it best, that prison officials, and this is in prison legal news, that prison officials, and this is a quote, have the duty to reduce the temptation for prisoners to commit more crimes and to curtail their access to the means of committing them. But you're already reviewing for content. I'm sorry? You're already reviewing for content. If you have a letter that makes a threat or a threat, you can't prevent that, right? Well, if it's, if it's blatant and overt in that manner, yes. But if it's, if it's... You have a blatant and overt limitation on your policy about content? No, no, Your Honor. But as to my example to Judge Rosenbaum, the challenge for prison officials is detecting the sort of subtle, indirect conspiracy threats and the like. And that's why these policies were created, to address those non-blatant issues and threats. All right, let me ask you, you're running out of time, and I'll give you a couple of extra minutes like I did Mr. Jones. If you could add two minutes to his time, please. Thank you. Why do you think the Eighth Circuit's decision in outlaw is incorrect? A couple of reasons. The Eighth Circuit there, that case dealt with packages. It's, I believe it was transcript in packages between the prisoner and the prisoner's attorney. And the, I guess the prison in that case argued, well packages are just different than letters in Martinez. And the Eighth Circuit didn't buy that distinction, frankly. And what we've been arguing, and what I've been suggesting to Judge Rosenbaum, is that emails are not like packages. Emails are not like letters. Those are more akin. And so we don't believe that, that they're the same. We don't believe Martinez applies. We believe several reasons why. For example, we don't believe that Martinez even created a standard to begin with because in Turner itself, the court said that Martinez expressly did not create a governing standard for, quote, prisoner rights cases. But doesn't Thornburg sort of say that there is a Even if you limit it to just hard copy mail. Okay. Is that right? Well, even there, Your Honor, the Thornburg opinion is sort of, it gives it and it taketh away. Because You could say that about a lot of Supreme Court opinions. That's correct, Your Honor. But in Thornburg, what the court said there is that it drew a distinction with outgoing mail. And as my rationale there was that outgoing letters that were at issue in Martinez didn't create as significant a security risk. What we are suggesting, and what we've argued below, and what the district court correctly agreed with, and what we've pointed out to Judge Rosenbaum, is that emails, because of its expeditious nature, is just simply different than letters in terms of the security risk it creates. And therefore, And that may be the case, or it may not be the case. But if you're right that that Martinez doesn't apply to outgoing correspondence, then what is left of Martinez? We know that Thornburg said that Thornburg didn't throw it all away, didn't abrogate it completely. It left a kernel of it intact. And it seemed to me like the kernel it left intact was outgoing correspondence. Well, what it left intact, and where it would apply, is if this case had to do with the letters Mr. Benning sent to his sister, Ms. Knott. That's not what this case is about. This case is about electronic communication emails. And Martinez most certainly did not apply to that. And to answer Your Honor's question, there isn't a single case by the Supreme Court, or this Court, where either the Supreme Court or this Court has applied the Martinez standard in the almost 50 years since Martinez was decided. Time and again, the Supreme Court has said that the Herculean and inordinate challenge of managing a prison, a modern prison, with modern risk posed by emails and the like, requires deference to acknowledge that and said that Turner is the governing standard. And those cases, the Perry case, for example, that dealt with pen pals. But Pesci did not involve outgoing correspondence of any kind. It involved a newsletter, if I recall correctly, the Duck Soup newsletter. Distributed within the prison walls, right? Yeah, but Perry, Your Honor, dealt with outgoing correspondence to pen pals, for example. And there, this Court used a Turner analysis. In PLN also, the prison legal news, contrary to what my friend said, and I see my time is almost up. That's okay. You can keep going because I have one more question. Okay. In Perry, Your Honor, the Court used the Turner standard. So my friends cannot point to a single case where this Court, or most importantly, the Supreme Court, has used the Martinez standard in an expansive way. And what they're asking this Court to do is to do what the Supreme Court itself has not done in almost 50 years, which is to expand the reach of Martinez to cover electronic communication. This Court should not do that because no other court has done it. But you're wrong about that because the Eighth Circuit did it in outlaw. You just think it's different. In outlaw, they did it. But they expanded it because if you're right that Martinez only applies to a letter, then the Eighth Circuit would have said, no, packages are not letters. We're stopping there. But now you're right that outlaw is different because outlaw didn't involve email. So here's my question to pivot to it. Did you have your question on this issue? No, no. It's okay. On the due process issue, let's assume that you prevail either under Martinez or Turner on the First Amendment claims, right? That doesn't mean that Mr. Benning doesn't have a liberty interest in his outgoing correspondence, right? It just means that your regulations satisfy the Constitutional First Amendment standard. Is that right? Again, we go back to the definition of correspondence. No, no, no. I'm assuming you win on the First Amendment issues. That doesn't mean that he doesn't have a First Amendment, that he has a liberty, doesn't mean he has a liberty interest in his outgoing correspondence. Martinez makes that clear, right? Martinez makes clear that he has a liberty interest in his outgoing emails. So you don't have to provide any notice whatsoever when you censor emails and prevent them from going out. And Mr. Benning knew that. It doesn't matter whether he knew that. My question is whether you believe that the department has any obligation to provide notice to an inmate when it censors outgoing correspondence via email. We believe so, Your Honor, because Martinez did not create a liberty interest in email communication. No, the Supreme Court has not done so. Martinez has been, is pretty clear. Aren't there a lot of due process cases, a fair number of them, holding that inmates are entitled to some due process when prison authorities censor or seize correspondence, incoming or outgoing? And here, Your Honor, the prison, and I know my friends on the other side love to use the word censorship, but that's not what happened here. Mr. Benning was able to communicate with Ms. Knott and with the Olive Institute. Let's not, let's not use semantics. You censored the email because it didn't go out. The email, yes, the emails were withheld. That's called censorship. It may be valid, you may be right, but you censored, right? Because that's what you think emails that require or request a forwarding create all sorts of problems for you. So you think you can do this without providing any notice to inmates that you've made a decision to not send an outgoing email because it requests forwarding. You don't have to tell inmates at all that you're doing this. Well, as the law exists now, Your Honor, there is no liberty interest. I'm not Well, it's not just in terms of qualified immunity, Your Honor. The law as it exists now does not create a liberty interest for Mr. Benning to communicate with email. And therefore, Mr. Benning, the Department of Corrections. Does the fact though that he pays, isn't it like 37 cents per letter to send an email, does that have any impact at all on this? That he should get some notice at least that his email isn't going out. He's paying for it, but it's not going. That may be a commercial sort of transactional sort of issue. But in terms of, you know, whether it creates a liberty interest, that kind of contractual sort of financial relationship, I don't know if that creates a liberty interest. What I do know is that Martina certainly didn't create a liberty interest. There is no Supreme Court case that has created a liberty interest in email communication. Let's take, for example, the fact that tomorrow, the Georgia Department of Corrections could discontinue the email program. And that would be okay because Mr. Benning can communicate with his lawyer, with his sister and so on with mail. But if they do that with traditional mail and prevent Mr. Benning from communicating with his sister or his attorney or whatsoever, that creates a problem. And so there is a liberty interest there that warrants due process protection. Whereas with the privilege of communicating expeditiously and efficiently with all the sort of marvels of modern technology, that, and Mr. Benning I think said he prefers to communicate with email because of its efficiency. That by itself does not create a liberty interest, Your Honor. Let me ask you a question going back then to the first issue. And what I'm wondering is you originally came in and compared the emails to telephone calls. So let's assume, if I'm understanding the way the telephone calls work, that Mr. Benning has his mother on a preclearance for a telephone call or clearance for it and goes ahead and calls her and has that exact conversation about the flu bug and please tell Adam. Is that going to be allowed or is that going to be censored in some way? The telephone call? Yes. It's probably going to be allowed. Okay. So then that brings me back to the same problem, right? Because even though I was understanding your efficient communication issue as a security risk, if you can do it over the phone anyway, what difference does it make? Well, Your Honor, there is no case law, and especially under Turner's reasonableness and deferential standard, that requires the Georgia Department of Corrections to be perfect and to bat a thousand and to prevent every threat and any threat. Sure, there will be communication like, you know, the telephone call you suggest or the hypothetical I suggest that probably gets through and creates a security risk. And sure, there may be instances where, as in here, Mr. Benning's emails, which I would grant were probably sort of innocuous, were withheld. But there is no case law, especially under Turner and its progeny, that requires that the Georgia Department of Corrections don't have regulation to stave off potential threats because there could be variances or there could be a call or an email that gets through. So your argument basically is if there's a mistake made in withholding less than 4% of the emails, that's okay. We don't have a due process issue. Well, we're arguing that we don't have a due process issue because there is no liberty interest in emailing to begin with. We're also arguing that the... I'm sorry, Your Honor. You did this with regular hard copy letters. Would there be a due process requirement of notice? Absolutely. And Mr. Benning consents that. And what Mr. Benning is arguing is that he wants the email SOP to be identical to the letter SOP. Because what Mr. Benning argued and showed below is that if his letters were withheld, he would have a hearing, he would have all of these processes that he has with his letter that he doesn't have with his email. And that just goes to show our point, Your Honor, that there is a liberty interest. Why wouldn't you provide, if you do it with a letter, why wouldn't you provide notice with an email? Because there's a liberty interest, as created in Martinez, for communication of letters. So it does create a liberty interest. With letters. You just say it doesn't extend to emails. That's correct. Okay. All right. Thank you very much. We've taken you way over your time, but we appreciate the help. Thank you, Your Honor. Did you have another question? No. Thank you. Sorry. Thank you, Your Honors. First of all, just a quick correction. I believe my friend said that this court's decision in the Perry case involved outgoing mail. The Perry case involved incoming mail, mail that prisoners receive in the prison. So the fact that Turner applied there is irrelevant because that case didn't involve outgoing correspondence and it didn't involve email at all. Plus, I would note that this court in Perry quoted the exact language in Thornburgh where the Supreme Court said Martinez's heightened scrutiny still applies to— Why should there be two different standards, whether it's outgoing or incoming? So what the Supreme Court explained in extensive detail in Thornburgh is that incoming correspondence and outgoing correspondence in the prison context present completely different security concerns. Outgoing correspondence, the court said, and I'll just read some of the language because it's important. This was the basis for the its very nature pose a serious threat to prison order and security. And this is a quote, The court explained that that's because correspondence sent outside the prison can't reasonably be expected to present a danger to the community inside the prison. That's true of letters and emails alike. Your contention is if it's an outgoing correspondence that sets up a crime to take place outside the institution, it's okay? No, there are all kinds of other policies and procedures that the defendants have that prevent both outgoing letters and outgoing packages and outgoing newsletters and outgoing emails from threatening anyone or containing any other dangerous material. Our objection is censoring what my friend described correctly as innocuous and in fact beneficial content just because Mr. Benning asked his sister to forward his allegations of official corruption to Congress. So a handwritten letter has to be examined by somebody and interpreted, but the use of some algorithm or program to hit keywords on an email is completely different. So if anything, I think what some of the questions have suggested is that the review of email is actually less problematic specifically because of the ability to use keyword searches and which letters. It's actually probably more secure and efficient, if anything, rather than less. So that would suggest that these additional restrictions on email are irrational and potentially upside down. You're not challenging any of the content-based restrictions other than the forwarding. We are challenging only the no forwarding policy and the rule that prohibits mentioning anything about any other inmate, including publicly available information that's on the Department of Corrections website. Your Honor, I'm out of time. You could have 30 seconds to wrap up. Thank you, Your Honor. If anything, I just want to emphasize how overbroad these policies are. They are a dragnet blanket prohibition on any request to forward any email to anyone, even when there's no conceivable threat to security or order. And I'll just read you an after pages detailing official corruption. He talked about the mercy that he had been given, and he wrote, I must make that gift of mercy worth something. I want to make this world a better, more moral place. I want to contribute to society. I'm in prison, so this is where I must work. This is my motivation and goal. The sanctuary that the Georgia Department of Corrections has given me is a sanctuary. And he asked that that message be forwarded to Congress, and they censored it because he had asked that it be forwarded to Congress. That violates the First Amendment. The failure of notice violates due process. The district court's decision should be reversed. All right, Mr. Jones, thank you very much. Mr. Azra Prasad, thank you very much as well. We appreciate it.